OPINION
{¶ 1} Defendant-appellant Dennis Mink appeals from his conviction and sentence on one count of Domestic Violence. Mink contends that the trial court erred when it denied his motion for judgment of acquittal, and also that his conviction is against the manifest weight of the evidence. After reviewing the evidence in the record, we conclude that the trial court did not err in denying Mink's motion for judgment of acquittal, and we conclude that his conviction is not against the manifest weight of the evidence. Accordingly, the judgment of the trial court is affirmed.
 I {¶ 2} One day in late November, 2002, Sara Vanderveen went to work and left her son, Teddy Schoonover, in the care of defendant-appellant Dennis Mink. When Mink went to pick up Vanderveen from work, he took Teddy with him. At that time, Vanderveen noticed that her son had a bruise on his cheek and above his eye. Vanderveen asked Mink what had happened and Mink said, "he was in the bathroom and he was coming out of the bathroom door and seen my son standing facing toward the back of the rocking chair. It was rocking and said he yelled out `Hey' and he fell over the chair, the rocking chair into another chair and fell onto the floor." Mink told Vanderveen that Teddy had landed on a toy during the fall.
 {¶ 3} Dora Schoonover, Teddy's grandmother, testified that she saw Teddy on that day, and noticed bruises. Schoonover testified that Mink told her, that evening, that Teddy had hit a coffee table during the fall. The next day, Schoonover could see Teddy in the daylight, and noticed a "hand print" on one side of his face and a black eye on the other side. She asked her daughter, Vanderveen, how those injuries had occurred. Vanderveen said that Teddy had fallen out of the chair and hit a toy, citing Mink as her source for that information. Schoonover reported the incident to Childrens' Services, and later took Teddy to Childrens' Medical Center.
 {¶ 4} Detective Marylou Goodwill-Phillips investigated the incident. Mink explained to Goodwill-Phillips that he had yelled "Hey," startling the child, and causing the child to fall and strike the left side of his face on the wooden arm of the chair. Mink told the detective the child then continued to fall onto the floor, striking the right side of his face on a toy.
 {¶ 5} By agreement, Mink was formally interviewed a week later. Again, Mink told Goodwill-Phillips that Teddy had fallen, striking the left side of his face, and then fell on the right side of his face on a toy. Goodwill-Phillips gave Mink a life-size doll and asked him to recreate the incident. Goodwill-Phillips' testimony on this point is worth reciting in detail.
 {¶ 6} "Q. What did you ask Mr. Mink to do with the doll?
 {¶ 7} "A. I asked him to position the chairs in the interview room — umm — in the same fashion that the chairs involved in the incident were at the time of the incident. And using the doll to show me what the child was doing when he came into the room and what happened after that.
 {¶ 8} "Q. Did he do so?
 {¶ 9} "A. — Umm — he made four attempts — umm — to show me how the child would fall and strike that part of his face. He did cause the doll to fall and strike the left side — umm — of the face on the arm of the chair next to it. However, he would stop prior to the completing the reenactment. And finally I asked him to show me all the way through to the point of conclusion. At that point he changed — umm — his description and action to — umm — how the child struck the left side of his face that he actually rolled onto the floor, face first onto the toy.
 {¶ 10} "Q. And how was that different from what he told you before?
 {¶ 11} "A. The actions prior to that he had described falling, striking the left side of his face and then falling, striking the right side of his face. Which was then changed to falling face first into the toy there.
 {¶ 12} "Q. And how many attempts did Mr. Mink make to try to recreate the version of how Teddy was injured on that date?
 {¶ 13} "A. There were four attempts and then there was a fifth — umm — display where he took it to completion at my request.
 {¶ 14} "Q. And was Mr. Mink ever able in any of those attempts to duplicate his version of what had happened?
 {¶ 15} "A. It was ackward [sic] and the motion was not smoothly [sic].
 {¶ 16} "* * *
 {¶ 17} "Q. When, so, you did explain to Mr. Mink your concern about him not being able to reenact exactly how the injuries occurred to Teddy, is that correct?
 {¶ 18} "A. Yes.
 {¶ 19} "Q. And was he able to explain how he was not able to recreate that?
 {¶ 20} "A. No, he became very defensive and he stated that he didn't want to answer any more questions. That he wanted an attorney."
 {¶ 21} Dr. William Matre, from Childrens' Medical Center, examined Teddy the day after the injury. He noted bruising on both sides of the child's face and neck. He noted stippling on the left side of the face from the angle of the jaw to behind the ear, and on the right cheek and on the back and left side of the neck and near the top of the eye. Dr. Matre testified that, in his opinion, these injuries were not consistent with falling on a toy. Upon cross-examination, Dr. Matre gave the following testimony:
 {¶ 22} "Q. Doctor, I understand that the explanation that you were provided was that the child fell on a toy?
 {¶ 23} "A. Correct.
 {¶ 24} "Q. And — umm — the child, I'm going to give you a hypothetical situation. If the child had been standing on a chair — umm — fell off of the chair, struck his face on the arm of the chair, and rolled off the chair and landed on a toy, would that be consistent with the injury by which you examined?
 {¶ 25} "A. I don't know. Its — I mean, I couldn't explain the bruising on both sides of the face, if he hit one or the other. Or fell onto the other side, I suppose it's possible."
 {¶ 26} Vanderveen testified that her son, Teddy, has Ehlers-Danlos syndrome. Vanderveen, who also has this condition, testified that it causes the subject to bruise easily.
 {¶ 27} Mink was charged by indictment with one count of Domestic Violence, one count of Assault, and one count of Child Endangering. Following a bench trial, Mink was found guilty on all charges, but the Assault and Child Endangering charges were merged with the Domestic Violence conviction. Mink was sentenced to 180 days in jail, fined $1,000 and ordered to pay court costs. All the jail time was suspended, as well as $750 of the fine. Mink was ordered to complete a one-year term of supervised probation, to include anger management counseling.
 {¶ 28} From his conviction and sentence, Mink appeals.
 II {¶ 29} Mink's assignments of error are as follows:
 {¶ 30} "Trial court erred by overruling defendants Rule 29 motion since the state failed to supply sufficient evidence as to all the elements necessary to support the domestic violence charge.
 {¶ 31} "The trial court erred by not granting Mr. Mink's motion for acquittal because it was against the manifest weight of the evidence that he committed domestic violence."
 {¶ 32} Mink made a motion for judgment of acquittal at the close of the State's evidence, which was overruled. Mink's only evidence was the testimony of Darrell Herron, a Dayton police officer, who testified that when he saw the child at the home of the grandparents, after being dispatched there, the child's injuries appeared to be relatively minor. This testimony was not of any great significance. Accordingly, the real issues presented by Mink's two assignments of error are whether the evidence presented by the State are sufficient to sustain a conviction for Domestic Violence, and whether the conviction is against the manifest weight of the evidence. Both parties recognize that these issues turn upon whether the evidence can reasonably support a conclusion that Mink knowingly caused, or attempted to cause, physical harm to Teddy Schoonover. R.C. 2919.25(A).
 {¶ 33} Mink did not testify. Teddy Schoonover was only 19 months old, and did not testify. These were the only two persons present when Teddy Schoonover sustained his injuries. There is, then, no direct proof that Mink knowingly caused or attempted to cause Teddy's injuries — the evidence is circumstantial.
 {¶ 34} Mink was the only other person present when Teddy Schoonover was injured. Dora Schoonover, the child's grandmother, testified that when she saw Teddy the next day, in the daylight, she saw what "looked like a hand print on one side and a black eye on the other."
 {¶ 35} Furthermore, Dora Schoonover testified that both Mink and her daughter, Sara Vanderveen, first told her that Teddy had fallen and hit his head on a coffee table, Vanderveen attributing Mink as her source for that information. Sara Vanderveen denied having told her mother that. This evidence of a changed explanation of how Teddy came by his injuries, together with the difficulty that Mink experienced recreating the accident for Detective Goodwill-Phillips, supports a conclusion that Mink was not being honest in explaining how Teddy came by his injuries. This lack of honesty supports an inference that Mink had something to hide — in other words, that he had purposely caused Teddy's injuries.
 {¶ 36} Although we can hardly characterize the evidence in this case as being overwhelming, we do conclude that there is sufficient evidence in this record to permit a reasonable finder of fact to find, beyond a reasonable doubt, that Mink knowingly caused physical harm to Teddy Schoonover. Thus, the trial court did not err in denying Mink's motion for a judgment of acquittal, and Mink's conviction for Domestic Violence is not against the manifest weight of the evidence.
 {¶ 37} Both of Mink's assignments of error are overruled.
 III {¶ 38} Both of Mink's assignments of error having been overruled, the judgment of the trial court is affirmed.
Judgment affirmed.
Wolff, J., concurs.